UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

TEXTRON FINANCIAL CORPORATION,

      Plaintiff,

v.                                                             C.A. No. 09-617 ML

SHIP AND SAIL, INC., CHRISTINE M.
FOULKROD, DANIEL P. FOULKROD,
DAVID P. FOULKROD, ROBERT E.
CHAMBERLAIN, JR., EUGENE L.
BUTLER and RONALD E. SMITH

      Defendants.

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motion to Strike Jury Demand (Dkt No. 25) and Plaintiff's Motion to Dismiss Defendants' Counterclaims (Dkt No. 24). For the reasons set forth below, each motion is granted, in part, and denied, in part.

### I. Facts

The relationship between Textron Financial Corporation ("Textron") and Ship and Sail, Inc. ("Ship and Sail") began with a Wholesale Security Agreement entered into by the parties on May 19, 2005 ("2005 Credit Agreement"). In exchange for financing Ship and Sail's marine equipment purchases, Textron took a security interest in Ship and Sail's equipment and inventory. On the day that the 2005 Credit Agreement was executed, Christine Foulkrod, Daniel

1

Foulkrod, and David Foulkrod ("2005 Guarantors")[1] each executed a separate Guaranty ("2005 Guaranties") promising to pay Textron in the event of a default by Ship and Sail.

On June 4, 2008, Textron and Ship and Sail entered into a new loan agreement,[2] the Credit and Security Agreement ("2008 Credit Agreement"). The 2008 Credit Agreement contains a jury waiver provision. The 2008 Credit Agreement was supported by the personal Guaranties ("2008 Guaranties") of Robert Chamberlain, Eugene Butler, and Ronald Smith ("2008 Guarantors"). The 2005 and 2008 Guaranties are identical in content and neither contains a jury waiver provision.

The relationship between Ship and Sail and Textron began to sour in November 2008 when Textron increased the interest rate on loans to Ship and Sail.[3] Ship and Sail at first agreed to

---

[1] For the sake of simplicity, in some instances, Ship and Sail and the various Guarantors will be referred to collectively as "Defendants."

[2] The 2008 Credit Agreement does not expressly replace the 2005 Credit Agreement. It does, however, provide the terms by which Ship and Sail may borrow money after its effective date. Textron's complaint alleges that Ship and Sail breached both agreements by failing to make the required payments. Yet, Textron later clarifies that "this case arises out of the 2008 Credit and Security Agreement, not the 2005 Wholesale Security Agreement." Textron's Reply in Support of Mot. to Strike 7. Textron argues that its claims arise from breaches that occurred subsequent to the execution of the 2008 Credit Agreement, making the 2005 Credit Agreement irrelevant. In contrast, Defendants' counterclaim in Count I states that the breaches of the covenant of good faith and fair dealing relate to both the 2005 and 2008 Credit Agreements. The fraud counterclaims, however, pertain only to the 2008 Credit Agreement.

[3] The terms of the 2008 Credit Agreement calculated interest at "the greater of (a) the highest rate of interest announced during such period by JPMorgan Chase Bank or other money center bank selected by Secured Party from time to time, or (b) any 'Minimum Prime' rate set forth in any applicable FTD." 2008 Credit Agreement ¶ 4(a). An FTD is a "Finance Terms Document" which Textron would provide "from time to time" identifying "the terms for an Advance." 2008 Credit Agreement ¶ 3. This provision gave Textron the authority to issue an FTD altering the interest rate "from a 'prime plus' rate to a LIBOR-based rate." Answer and Countercl. ¶ 22. An FTD would not go into effect unless Ship and Sail accepted the terms either expressly or by failing to reply. Ship and Sail apparently signed an acceptance of the increased

the change but in January 2009, Ship and Sail sent a letter to Textron revoking its acceptance of the interest rate change.[4] At some point, Ship and Sail stopped making payments to Textron. On August 31, 2009, Textron served Ship and Sail with a Notice of Default. In September 2009, Ship and Sail made an attempt to sell several boats in its inventory at a boat show. On September 11, 2009, Textron hung large signs on the boats at the show stating "this vessel is subject to a security interest and lien in favor of Textron." Def.s' Answer and Countercl. ¶ 40. Ship and Sail was unable to sell any of the boats and ultimately it closed its business in October 2009.

On December 22, 2009, Textron filed a complaint alleging breach of contract against Ship and Sail and an action on guaranty against the Guarantors. The Complaint alleges that the six individual Guarantors are personally liable to Textron for Ship and Sail's debt. Defendants filed an Answer and Counterclaim alleging eight counterclaims[5] and demanding a "trial by jury on all issues so triable." Answer and Counterclaim 30. The matter before the Court now concerns Textron's Motion to Strike Jury Demand and Textron's Motion to Dismiss Defendants' Counterclaims.

---

interest rate in order to continue to meet its financing needs.

[4] Nothing in the 2008 Credit Agreement expressly provides that Ship and Sail has the power to revoke an FTD. The agreement itself, however, may be terminated by either party at any time. Ship and Sail contends that Textron, after receiving the letter allegedly revoking the interest rate change, promised to charge interest at the old rate. According to Ship and Sail, Textron never followed through and the new (higher) interest rate continued in effect until Ship and Sail defaulted.

[5] The counterclaims alleged include: Count I, breach of covenant of good faith and fair dealing; Count II, fraud by nondisclosure and concealment; Count III, intentional misrepresentation/fraud; Count IV, fraudulent inducement; Count V, duress; Count VI, negligent misrepresentation; Count VII, tortious interference with prospective business relations; and Count VIII, failure to dispose of collateral in a commercially reasonable manner.

## II. Motion to Strike Jury Demand

### A. Standard of Review

"The Seventh Amendment to the United States Constitution guarantees the right to a jury trial in suits at common law . . . ." Luis Acosta, Inc. v. Citibank, N.A., 920 F.Supp 15, 18 (1st Cir. 1996). When a party makes a jury demand "the trial on all issues so demanded must be by jury unless . . . the court . . . finds that on some or all of those issues there is no federal right to a jury trial." Fed. R. Civ. P. 39(a)-(a)(2). The right to a jury trial "may be waived, but only with difficulty, and the waiver must be clear and unequivocal." Luis Acosta, 920 F.Supp. at 18. The "right to a jury is fundamental and . . . its protection can only be relinquished knowingly and intentionally." Id. (quoting National Equipment Rental, Ltd. v. Hendrix, 565 F.2d 255, 258 (2d Cir. 1977)). Since the right is fundamental, "courts indulge every reasonable presumption against waiver." Aetna Ins. Co. v. Kennedy ex rel. Bogash, 301 U.S. 389, 393 (1937).

### B. Discussion

The 2008 Credit Agreement contains a jury waiver provision. Defendants, however, have demanded a jury trial on all issues so triable. Textron moves to strike that demand. In diversity actions, as is the case here, federal law governs the right to a jury trial. See Simler v. Conner, 372 U.S. 221, 222 (1963); see also Medical Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11,18 (1st Cir. 2002). Under federal law, "courts will not enforce the jury waiver unless it was entered into knowingly and voluntarily." Medical Air Tech., 303 F.3d at 19.

4

The First Circuit lists six factors to be considered when determining whether a waiver is knowing and voluntary:

> 1) the [parties'] education, business experience, and sophistication;
> 2) the parties' respective roles in deciding the final terms of the arrangement;
> 3) the agreement's clarity;
> 4) the amount of time available to the [party] to study the agreement before acting on it;
> 5) whether the [party] had independent advice – such as advice of counsel – when she signed the agreement; and
> 6) the nature of the consideration tendered in exchange for the waiver.

Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181 n.3 (1st Cir. 1995) (analyzing voluntary and knowing waiver of ERISA benefits). The list, however, is not exhaustive and "no single fact or circumstance is entitled to talismanic significance on the question of waiver." Id.

### i. Knowing and Voluntary Waiver as Applied to Ship and Sail

Contractual jury waiver provisions will only be enforced where the plain language of the provision "unambiguously covers the claims asserted" and where the waiver "was entered into knowingly and voluntarily." See Medical Air Tech., 303 F.3d at 19. The First Circuit has not yet decided which party bears the burden of proving that a jury trial waiver is knowing and voluntary. See d. at 18 n.3. In this case, the Court finds that Textron has made a sufficient showing to demonstrate that Ship and Sail's waiver was knowing and voluntary with regard to the jury waiver provision in the 2008 Credit Agreement.

Textron asserts, and this Court finds, that Ship and Sail is a sophisticated party. Ship and Sail was in business for almost three decades and has had numerous interactions with Textron in an effort to secure multi-million dollar loans.

5

The jury waiver provision at issue is conspicuous. The waiver language is capitalized, in bold print, and it is placed at the end of the last paragraph of a four page document, just a few centimeters above the signature line. It states that "**each party hereto, following consultation with legal counsel, KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS WITH REGARD TO DISPUTES IN ANY WAY DIRECTLY AND/OR INDIRECTLY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.**" 2008 Credit Agreement ¶ 16.

As to any disparity in bargaining power, even though Textron drafted the 2008 Credit Agreement, Ship and Sail had an opportunity to review the agreement and walk away if it found the terms unsatisfactory. In addition, the jury waiver provision applies equally to both parties. There is no indication that the relative bargaining power between the parties was grossly uneven.

Although Textron asserts that Ship and Sail was represented by counsel, Ship and Sail specifically avers that it "did not consult an attorney or have an attorney review the Credit and Security Agreement before it was executed." Decl. of David Foulkrod ¶ 7, July 26, 2010. Yet, the 2008 Credit Agreement states that Ship and Sail waived its right to a jury trial "following consultation with legal counsel." 2008 Credit Agreement ¶ 16. This provision, in combination with Ship and Sail's prior business experience and the very nature of the multi-million dollar loan, put Ship and Sail on notice that legal representation would be prudent. Ultimately, however, the fact that a party is not represented by counsel does not, by itself, render a jury trial waiver unenforceable. See Collins v. Countrywide Home Loans, Inc., 680 F.Supp.2d 1287, 1296 (M.D.Fla. 2010).

After considering the totality of the circumstances, the Court finds that Ship and Sail was a

sophisticated buyer looking to secure a substantial loan; the jury waiver provision was clear and conspicuous; and nothing in the terms of the agreement or the relationship between the parties tends to show any gross disparity in bargaining power. Accordingly, the Court finds that the waiver is knowing and voluntary and enforceable against Ship and Sail in spite of the fact that Ship and Sail *chose* not to consult with legal counsel.

ii. Knowing and Voluntary Waiver as Applied to the Guarantors

Defendants claim that even if Ship and Sail waived its right to a jury trial, that waiver should not be imputed to the Guarantors. While the 2008 Credit Agreement between Textron and Ship and Sail does contain an enforceable jury waiver provision, neither the 2005 nor the 2008 Guaranties contain a jury waiver provision. Textron relies on Rhode Island law in support of its assertion that the provisions of one agreement may be imputed into another agreement between the parties when they are executed at the same time, for the same purpose, and in the course of the same transaction. See Rhode Island Depositors Economic Protection Corp. v. Coffey & Martinelli, 821 A.2d 222, 226-27 (R.I. 2003). Textron's reliance upon state law, however, is misplaced.

In diversity actions, federal law governs the right to a jury trial. See Simler, 372 U.S. at 222. "There is a presumption against denying a jury trial based on a waiver, and waivers must be strictly construed." Medical Air Tech., 303 F.3d at 18 (citing Aetna Ins. Co., 301 U.S. at 393). Where the waiver is "part of a separate contract, signed only by certain parties to the larger transaction, . . . parties seeking enforcement of the waiver may have a more difficult task in showing that the waiver was voluntary and knowing." Medical Air Tech., 303 F.3d at 19. The

7

fact that the Guaranties do not contain a jury waiver provision is significant under federal law, which generally provides that "a jury waiver provision in a contract . . . affects only the rights of the parties to that contract." Hulsey v. West, 966 F.2d 579, 581 (10th Cir.) (emphasis added); see also Medical Air Tech., 303 F.3d at 18.

In this case, both the 2005 and 2008 Guaranties contemplate later financial agreements between Ship and Sail and Textron. Under the terms of the Guaranties, each of the Guarantors "unconditionally and irrevocably guarantees . . . without off-set or deduction, the prompt payment and/or performance of all indebtedness, obligations and liabilities of . . . [Ship and Sail]." Ronald Smith Guaranty ¶ 1. While the Guaranties do, by their terms, incorporate Ship and Sail's future debts and obligations, the language of those Guaranties is silent as to the Guarantors' right to a jury trial. Jury waivers "should be based on nothing less than an affirmative representation by the party himself." Heyman v. Kline, 456 F.2d 123, 130 (2nd Cir. 1972). Accordingly, this Court finds that the Guarantors have not waived their right to a jury trial.

### III. Motion to Dismiss Counterclaims

#### A. Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court must accept the truth of all the well-pleaded facts in the complaint and draw "all reasonable inferences in the plaintiffs' favor." Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir. 2008) (citing Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir. 2008)). This inquiry may be "augmented by

reference to (i) documents annexed to [the complaint] or fairly incorporated into it, and (ii) matters susceptible to judicial notice." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006).

In order to survive a motion to dismiss, "a complaint must allege a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)). A claim is plausible when it pleads sufficient facts that allow the "court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Medina v. Toledo, 718 F.Supp.2d 194, 202 (1st Cir. 2010) (quoting Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009)).

**B. Discussion**

### i. Count V: Duress Claim

Defendants allege that Ship and Sail only agreed to an increase in the applicable interest rate because it would otherwise be without financing. Defendants assert that Ship and Sail acted under duress. Textron has moved to dismiss this claim by asserting that Rhode Island does not recognize the tort of duress as an independent cause of action in civil cases. Textron principally relies upon a recent Rhode Island Supreme Court decision in which the Court stated that "undue influence and duress, traditionally considered wrongful under well-established precedent . . . are simply the means by which the alleged interference occurred." Lavoie v. North East Knitting, Inc., 918 A.2d 225, 229 (R.I. 2007) (quoting Cyr v. Cote, 396 A.2d 1013, 1019 n.7 (Me. 1979)).

Rhode Island recognizes duress only in actions for equitable remedies. See Id. (quoting the Restatement (Second) of Contracts as saying "the victim of duress or undue influence is

usually limited to avoidance and does not have an affirmative action for damages"); see also McGee v. Stone, 522 A.2d 211, 214 (R.I. 1987) (finding that duress may render a contract voidable). A claim for duress in a contract action may provide a defense as to the validity of the contract but duress itself is not an actionable tort and it does not create an independent right to damages. See Lavoie, 918 A.2d at 228-29.

Defendants allege in Count V of their counterclaims that they have suffered monetary damages as a result of duress inflicted by Textron. Under Rhode Island law, however, duress is not recognized as an independent cause of action entitling Defendants to damages. Accordingly, Count V must be dismissed as a counterclaim. Instead, it will be treated as a defense raised in the pleading. See Fed. R. Civ. P. Rule 8(c)(2) (stating that a Court may "treat the pleading as though it were correctly designated").

### ii. Count VII: Tortious Interference Claim

On August 31, 2009, Textron gave notice to Ship and Sail that it was in default. On September 11, 2009, prior to a boat show, Textron hung large signs on Ship and Sail's boats stating "NOTICE: THIS VESSEL IS SUBJECT TO A SECURITY INTEREST AND LIEN IN FAVOR OF TEXTRON FINANCIAL CORPORATION." Answer and Countercl. ¶ 40. Ship and Sail contends that the rumors created by the signs "cast a cloud of suspicion and doubt about Ship and Sail" and that, as a result of the signs, "Ship and Sail sold not a single boat at the show." Id. Ship and Sail alleges that the placement of the signs constituted an unauthorized entry onto its property and thwarted potential sales, constituting tortious interference with a prospective business relationship. Textron argues that it did not wrongfully interfere with a prospective

business relationship because the placement of the signs on the boats was an authorized action under the 2008 Credit Agreement.

Rhode Island recognizes the tort of tortious interference with a prospective business relationship. The elements of the tort include:

(1) the existence of a business relationship or expectancy,
(2) knowledge by the interferor of the relationship or expectancy,
(3) an intentional act of interference,
(4) proof that the interference caused the harm sustained, and
(5) damages to the plaintiff

Roy v. Woonsocket Inst. for Sav., 525 A.2d 915, 919 (R.I. 1987). The tort may relate to both prospective business relationships and existing contractual relationships. See Mesolella v. City of Providence, 508 A.2d 661, 670 (R.I. 1986).

Under Rhode Island law, there is no tortious interference with a business relationship when the means employed by the alleged interferor are legitimate. See Avilla v. Newport Grand Jai Alai LLC, 935 A.2d 91, 99 (R.I. 2007). In order to be liable, Textron must have acted without justification or for an improper purpose. See Belliveau Bldg. Corp. v. O'Coin, 763 A.2d 622, 628 (R.I. 2000). Rhode Island courts have adopted the Restatement (Second) of Torts defense to tortious interference. See id. at 129. The Restatement provides that there is no interference where a party asserts "in good faith a legally protected interest . . . by appropriate means . . . if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." REST 2d Torts § 773.

Under the terms of the 2008 Credit Agreement, in the event of a default, Textron was authorized "by itself or through an agent, without notice to any person and without judicial process of any kind, [to] enter into any premises . . . under the apparent control of Debtor . . . and

disassemble, render unusable and/or repossess all or any items of the Collateral." 2008 Credit Agreement ¶ 11. Textron hung signs on the collateral to give notice to potential buyers of its security interest. In doing so, Textron acted in a manner consistent with its authority to repossess the collateral under the 2008 Credit Agreement and it protected its financial interest in an appropriate manner. Where an action is not improper as a matter of law, dismissal is appropriate because no reasonable jury would find to the contrary. See Avilla, 935 A.2d at 99.

### iii. Count VIII: Claim for Failure to Dispose of Collateral in a Commercially Reasonable Manner

In October 2009, Textron repossessed the Ship and Sail boats. Defendants allege in their Answer and Counterclaim that Textron's disposition of those boats was not commercially reasonable. Defendants claim, "[u]pon information and belief, those boats have been sold or are being offered for sale at prices far below fair market value." Def.s' Answer and Countercl. ¶ 45. Under Rhode Island law, "[e]very aspect of a disposition of collateral . . . must be commercially reasonable." R.I. Gen. Laws § 6A-9-610(b). Defendants assert that the collateral sales were not commercially reasonable and that, as a result, Defendants "suffered and continue to suffer monetary damages." Answer and Countercl. ¶ 90. Textron argues that, irrespective of whether the disposition was commercially reasonable, Defendants have failed to allege in their pleading that any deficiency has not been reduced.

A claim for damages is not permitted, under R.I. Gen. Laws § 6A-9-625(d), when the sale, commercially reasonable or not, is used to eliminate or reduce the deficiency. Subsection (b) of R.I. Gen. Laws § 6A-9-625 recognizes "[d]amages for noncompliance" as a potential remedy

where the disposition of collateral is not commercially reasonable. R.I. Gen. Laws § 6A-9-625(b). Subsection (b) provides that "a person is liable for damages in the amount of any loss caused by a failure to comply with this chapter. R.I. Gen. Laws § 6A-9-625(b). Susbsection (d), however, limits the available remedy when the deficiency is eliminated or reduced. "[A] debtor . . . whose deficiency is eliminated or reduced . . . may not otherwise recover under subsection (b) for noncompliance with the provisions of this part relating to collection, enforcement, disposition, or acceptance." R.I. Gen. Laws § 6A-9-625(d).

Defendants have not alleged in their Answer and Counterclaim or in their Opposition that the collateral sales were not used by Textron to reduce the deficiency. Defendants have alleged no facts that state a plausible claim to relief for damages under R.I. Gen. Laws. Defendants, however, may assert a right to setoff as an affirmative defense. "If a party mistakenly designates a defense as a counterclaim . . . the court must, if justice requires, treat the pleading as though it were correctly designated . . . ." Fed. R. Civ. P. 8(c)(2). Therefore, Count VIII is dismissed as a counterclaim and, instead, it will be construed as a defense properly raised in the Answer and Counterclaim.

### iv. Count I: Breach of Good Faith and Fair Dealing

#### a. Timeliness

Defendants allege in Count I of their counterclaims that Textron breached the implied covenant of good faith and fair dealing inherent in all contracts. Textron argues for dismissal on the ground that this counterclaim is barred by the one year contractual limitations period of the

13

2008 Credit Agreement. The 2008 Credit Agreement provides that "[a]ny claim which [Ship and Sail] may have against [Textron] arising out of the Agreement or the transactions contemplated herein must be asserted by [Ship and Sail] within one (1) year of it accruing or else it shall be deemed waived." 2008 Credit Agreement ¶ 16.

The general rule in Rhode Island is that "a cause of action accrues and that therefore the statute-of-limitations clock starts ticking at the time that an injury occurs." Soares v. Ann & Hope of Rhode Island, Inc., 637 A.2d 339, 352-253 (R.I. 1994). Textron argues that Ship and Sail's alleged date of injury was in June 2008 when the parties first entered into the 2008 Credit Agreement. Defendants, on the other hand, allege that the injury accrued at a later date, the earliest of which was August 31, 2009, when Textron sent notice that Ship and Sail was in default.

The factual questions as to the date of the injury preclude dismissal. Under Rhode Island law, this claim must await further development of the record.

b. The Contractual Limitations Period as Applied to the Guarantors

Textron argues that the contractual limitations period is imputed to the Guarantors and bars their claims. In the Guaranties, the Guarantors promised "the prompt payment and/or performance of all indebtedness, obligations and liabilities of [Ship and Sail] at any time owing to Textron." Ronald Smith Guaranty ¶ 1. Textron claims that one of the Guarantors' "obligations" was to assert any claims within the one year limitations period. Textron further argues that the one year contractual limitations term in the 2008 Credit Agreement is imputed to the Guaranties since the instruments were enacted "at the same time, for the same purpose and in the course of

the same transaction" Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996).

"[I]nstruments executed in the course of a single transaction[,] at the same time[,] and to accomplish the same purpose should be read and construed together." Coffey & Martinelli, 821 A.2d at 226. In Coffey & Martinelli, the Court imputed the terms of a later-occurring promissory note to a guaranty that was executed earlier in time. The Court construed the terms of the documents together because the guarantor had "subscribe[d] to all obligations and requirements contained" in the loan agreement. Id. at 227.

Under Rhode Island law, therefore, both the 2005 and 2008 Guaranties are construed together with the 2008 Credit Agreement as a single instrument. The 2008 Guaranties were executed at the same time, in the same place, and as part of the same transaction as the 2008 Credit Agreement. The 2005 Guaranties were executed three years prior to the 2008 Credit Agreement but since the Guarantors expressly assumed Ship and Sail's "obligations," the one year contractual limitation period would be imputed to those Guaranties. Both the 2005 and 2008 Guaranties reference and contemplate the obligations contained in future agreements between Textron and Ship and Sail. See Rotelli, 686 A.2d at 94 (finding that "instruments referred to in a written contract may be regarded as incorporated by reference").

Although the one year limitation period is imputed to the Guaranties, dismissal is not appropriate because the record is not clear at this point as to when the alleged breach of contract claim accrued.

### c. Conduct Expressly Authorized by the Loan Agreement

"A party's actions . . . do not violate the covenant of good faith and fair dealing when they

were contemplated by the parties at the time of contract formation." Hord Corp. v. Polymer Research Corp. of America, 275 F.Supp.2d 229, 238 (D.R.I. 2003). Textron argues for dismissal of the breach of contract counterclaim on the alternative grounds that its conduct was authorized under the 2008 Credit Agreement. Textron asserts that it never breached the implied covenant of good faith and fair dealing because it was expressly authorized to adjust Ship and Sail's credit limit, raise their interest rate, and repossess the collateral. Defendants, however, have alleged a wider array of wrongful conduct, including allegations of bad faith involving numerous persons and correspondence over a period of many months. Such conduct was not expressly authorized by the 2008 Credit Agreement. Assuming the alleged facts to be true and drawing all inferences in Defendants' favor, Ship and Sail has alleged a plausible claim to relief.

### v. Counts II, III, IV, & VI: Fraud Claims

#### a. The Contractual Limitations Period as Applied to the Tort Claims

The bulk of Defendants' counterclaims relate to various alleged frauds perpetrated by Textron. Textron argues for dismissal of those counterclaims on the basis that they are time-barred by the one year limitation period contained in the 2008 Credit Agreement. The 2008 Credit Agreement provides that "[a]ny claim . . . *arising out of* this Agreement or the *transactions* contemplated herein must be asserted by Debtor within one (1) year." 2008 Credit Agreement ¶ 16 (emphasis added). Defendants argue, however, that their tort claims, unlike their breach of contract claim, do not "aris[e] out of" the 2008 Credit Agreement. Before deciding whether the claims are timely, this Court must determine whether the tort claims are subject to the contractual

limitations period.

Under Rhode Island principles of contract interpretation, a court must not engage in judicial construction of a contract unless the language is ambiguous. See McBurney v. Teixeira, 875 A.2d 439, 443 (R.I. 2005). "[A]n agreement is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation." Id. The ambiguity of a contract provision is assayed in light of the document as a whole and the language is given its "plain, ordinary, and usual meaning." Id.

The 2008 Credit Agreement provides that "[a]ny claim . . . arising out of this Agreement or the transactions contemplated herein must be asserted . . . within one(1) year." 2008 Credit Agreement ¶ 16. In Hays v. Mobil Oil Corp., 930 F.2d 96, 100 (1st Cir.), the First Circuit concluded that similar language in a contractual limitations provision was sufficiently broad to encompass a statutory claim. And, the Eleventh Circuit has found that tort actions that "occur[] as a fairly direct result of the performance of contractual duties" *arise out of* the agreement. Telecom Italia, SpA v. Wholesale Telecom Corp., 248 F.3d 1109, 1116 (11th Cir. 2001). In the case at bar, the alleged fraudulent conduct relates to concealment, misrepresentations, and other wrongful acts involving both formation of the 2008 Credit Agreement and Textron's performance under that agreement. The tort claims asserted here in Defendants' counterclaims are so closely connected to the agreement at issue that the Court concludes that the parties necessarily intended for such claims be subject to the limitation provision.

b. Timeliness of the Tort Claims

Textron argues that Defendants' tort claims are untimely and therefore subject to

17

dismissal. Where fraud is alleged, "[t]he statute of limitations begins to run when a party becomes aware of [the] fraudulent conduct." Carney v. Kardinal Land, Inc., 813 A.2d 50, 53 (R.I. 2003). Ship and Sail has stated that on December 22, 2008, it "first began to realize it had been the victim of a fraudulent scheme." Answer & Countercl. ¶ 19. The alleged frauds and misrepresentations, however, continued up until Textron seized the boats as collateral on October 31, 2009. Defendants' statement as to their initial suspicion of a general fraudulent scheme cannot be properly characterized as awareness of the alleged fraudulent conduct at this stage. A statute of limitations defense is proper only if the time defect is apparent on the face of the complaint. See Barrette v. Yakavonis, 966 A.2d 1231, 1234 (R.I. 2009). There remains a factual question as to the accrual of these claims. Accordingly, dismissal of the tort claims is not proper at this time.

### IV. Conclusion

Textron's motion to strike the jury demand is GRANTED with regard to Ship and Sail and DENIED with regard to the individual Guarantors.

Textron's motion to dismiss Defendants' Count V counterclaim for duress is GRANTED.

Textron's motion to dismiss Defendants' Count VII counterclaim for tortious interference is GRANTED.

Textron's motion to dismiss Defendants' Count VIII counterclaim for failure to dispose of the collateral in a commercially reasonable manner is GRANTED.

Textron's motion to dismiss Counts I, II, III, IV, & VI is DENIED.

SO ORDERED

_Mary M. Lisi_

Mary M. Lisi
United States District Judge
January 31, 2011